UNITED STATES DISTRICT COURT
<u>WESTERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| EYONA T., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case # 1:19-cv-1066-DB |
| | § | |
| COMMISSIONER OF SOCIAL SECURITY, | § | MEMORANDUM DECISION |
| | § | AND ORDER |
| Defendant. | § | |

## <u>INTRODUCTION</u>

Plaintiff Eyona T.  ("Plaintiff") brings this action pursuant to the Social Security Act (the "Act"), seeking review of the final decision of the Commissioner of Social Security (the "Commissioner"), that denied her application for supplemental security income ("SSI") under Title XVI of the Act. *See* ECF No. 1. The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g), 1383(c), and the parties consented to proceed before the undersigned in accordance with a standing order (*see* ECF No. 13).

Both parties moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). *See* ECF Nos. 9, 11. Plaintiff also filed a reply brief. *See* ECF No. 12. For the reasons set forth below, Plaintiff's motion for judgment on the pleadings (ECF No. 9) is **DENIED**, and the Commissioner's motion for judgment on the pleadings (ECF No. 11) is **GRANTED**.

## <u>BACKGROUND</u>

The record reflects two prior claims filed by Plaintiff. An SSI application filed in 2006 was denied by an Administrative Law Judge in 2009. Transcript ("Tr.") 49-63. A second SSI claim was dismissed by an Administrative Law Judge in 2013. Tr. 64-69. Thereafter, on October 1, 2015, Plaintiff protectively filed claims for SSI and Disability Insurance Benefits ("DIB"), alleging disability beginning January 1, 2015 (the disability onset date) due to bipolar disorder. Tr. 15, 187-

88, 212. Plaintiff's claims were denied initially on January 4, 2016, after which she requested a hearing. Tr. 70-78, 79-87, 88, 89,115-126, 236-239. On December 19, 2017, Administrative Law Judge Mary Mattimore (the "ALJ") conducted a hearing in Buffalo, New York. Tr. 93. Plaintiff appeared and testified at the hearing and was represented by Jeanne Murray, an attorney. *Id.* Jeanne Beachler, an impartial vocational expert ("VE"), also appeared at the hearing. *Id.* At the hearing, Plaintiff, through her representative, amended her alleged onset date to January 1, 2017. *Id.*

The ALJ issued an unfavorable decision on March 26, 2018, finding that Plaintiff was not disabled. Tr. 90-110. Plaintiff sought and was granted Appeals Council review. Tr. 175, 180-186. On June 14, 2019, the Appeals Council issued a decision, adopting all of the ALJ's statements regarding the issues and evidentiary facts, including all of the ALJ's findings and conclusions, except for Plaintiff's date last insured for DIB, and finding that Plaintiff was not disabled through March 26, 2018, the ALJ decision date. Tr. 1-8. The ALJ's March 26, 2018 decision thus became the "final decision" of the Commissioner subject to judicial review under 42 U.S.C. § 405(g).

## LEGAL STANDARD

### I.   District Court Review

"In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (citing 42 U.S.C. § 405(g)) (other citation omitted). The Act holds that the Commissioner's decision is "conclusive" if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (citations

omitted). It is not the Court's function to "determine *de novo* whether [the claimant] is disabled." *Schaal v. Apfel*, 134 F. 3d 496, 501 (2d Cir. 1990).

## II.     The Sequential Evaluation Process

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b). If so, the claimant is not disabled. If not, the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id*. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments meeting the durational requirements, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id*. § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, the claimant is disabled. *Id*. § 404.1509. If not, the ALJ determines the claimant's residual functional capacity, which is the ability to perform physical or mental work activities on a sustained basis notwithstanding limitations for the collective impairments. *See id*. § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id*. If he or she

cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id*. § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## ADMINISTRATIVE LAW JUDGE'S FINDINGS

The ALJ analyzed Plaintiff's claim for benefits under the process described above and made the following findings in her March 26, 2018 decision:

1.  The claimant has not engaged in substantial gainful activity since January 1, 2017, the alleged onset date (20 CFR 416.920(b) *et seq*., and 416.971 *et seq*.);

2.  The  claimant has the following severe impairment: bipolar disorder (20 CFR 416.920(C));

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926);

4.  The claimant has the residual functional capacity to perform a full range of work at all exertional levels, but she could perform no more than simple, routine work and make simple workplace decisions. The claimant can occasionally interact with supervisors, coworkers, and the public.  She cannot work at production rate (e.g., assembly line) pace;

5.  The claimant is unable to perform any past relevant work (20 CFR 416.965);

6.  The claimant was a younger individual, on the amended alleged disability onset date (20 CFR 416.963;

7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964);

8.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2);

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a));

10. The claimant has not been under a disability, as defined in the Social Security Act, from January 31,2017, the amended alleged onset date, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 90-110.

Accordingly, the ALJ determined that, based on the application for supplemental security benefits protectively filed on July 15, 2015, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act. Tr. 106. As noted above, the ALJ dismissed the claimant's request for hearing based on her application for a period of disability and disability insurance benefits under Sections 216(i) and 223(a) of the Social Security Act, and the initial determination dated January 4, 2016 remains the final determination with respect to that portion of her claim. *Id.*

## **ANALYSIS**

Plaintiff asserts two points of error. First, Plaintiff argues that the ALJ relied solely on a non-examining physician opinion and failed to develop the record for additional opinion evidence to formulate Plaintiff's RFC. *See* ECF No. 9-1 at 10-15. Therefore, Plaintiff argues, the RFC was not supported by substantial evidence. *See id.* Next, Plaintiff argues that the ALJ improperly diminished the weight given to Plaintiff's subjective complaints, failed to account for Plaintiff's bipolar disorder as a factor in her non-compliance with treatment, and mischaracterized Plaintiff's daily activities. *See id.* at 15-23.

The Commissioner responds that the ALJ considered the entire record, including Plaintiff's reports, her testimony, medical reports, and medical opinion evidence, and properly formulated Plaintiff's RFC based on the record as a whole. *See* ECF No. 11-1 at 16-23. Further, argues the Commissioner, it was Plaintiff's burden to show totally disabling functional limitations, and this she failed to do. *See id.* With respect to Plaintiff's second point of error, the Commissioner

responds that the ALJ provided good reasons to find Plaintiff's subjective complaints were not consistent with the record evidence. *See id*. at 23-27.

A Commissioner's determination that a claimant is not disabled will be set aside when the factual findings are not supported by "substantial evidence." 42 U.S.C. § 405(g); *see also Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). Substantial evidence has been interpreted to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court may also set aside the Commissioner's decision when it is based upon legal error. *Rosa*, 168 F.3d at 77.

Upon review of the record in this case, the Court finds that the ALJ properly considered the medical opinion evidence and the record as a whole to determine Plaintiff's RFC, and her finding that Plaintiff is not disabled is supported by substantial evidence.

The record reflects that Plaintiff had a history of bipolar disorder prior to the amended alleged onset date of January 1, 2017. *See* Tr. 270-74. For the most part, her bipolar disorder was successfully treated with Abilify. Tr. 273. In 2011, Plaintiff was an inpatient at Holly-Hill Behavioral Health System in North Carolina for nine days due to a severe bipolar hypomanic episode after she stopped taking her Abilify. Tr. 270, 273. Her mood was much better once she was back on Abilify. Tr. 270-71.

On March 5, 2015, Plaintiff initiated mental health treatment at Mid-Erie Counseling and Treatment Services ("Mid-Erie"). Tr. 295-306. Michael Finnegan, LMHCP ("Mr. Finnegan") performed a comprehensive assessment. *Id*. Plaintiff reported she lived with her mother, her mother's boyfriend, sister, niece, and nephew (Tr. 301-302), and that she currently did not get along with her mother and sister (Tr. 302, 311). She told Mr. Finnegan that her diagnosis was bipolar disorder, and her only medication was Abilify. Tr. 295, 309. She denied any harmful

ideation or substance use (Tr. 295, 300) and said she had anxiety, fast heart rate, fast speech, racing thoughts, and "visual distortions" (Tr. 295, 313-314), but she had no such issues when she was taking her Abilify (Tr. 295). Plaintiff indicated that she was currently unemployed, but she was "seeking" employment. Tr. 303. She also denied any difficulties performing work or work-like activity. Tr. 304.

On March 25, 2015, Plaintiff saw Arvind Samant, M.D. ("Dr. Samant"), at Mid-Erie, for a psychiatric initial assessment. Tr. 278-80. Plaintiff told Dr. Samant that she had mood swings, racing thoughts, and auditory and visual hallucinations and reported she took Abilify 25mg once daily. Tr. 278. At the time, she was currently studying nursing at a community college. *Id*. She denied any harmful ideation. *Id*. Upon mental status exam ("MSE"), Plaintiff was cooperative with an appropriate mood. Tr. 278-79. She reported her mood as "uneasy, fearful, and/or anxious. Tr. 279. She had a normal thought process; her thought content contained suspicious and/or paranoid thoughts; and no perceptual disorders were present. *Id*. Her orientation, memory, insight, and judgment were all fair. Tr. 279-80. Dr. Samant diagnosed bipolar disorder, mixed, and recommended medication and counseling. Tr. 280. Plaintiff was to return in eight weeks. *Id*.

Dr. Samant examined Plaintiff again on September 23, 2015. Tr. 276-77. Plaintiff denied any mood swings, racing thoughts, depression, or anxiety, and she reported no side effects from Abilify. Tr. 276. Findings on MSE were mostly normal with only orientation and memory assessed as fair. Tr. 276-77. Dr. Samant assessed Plaintiff as medically stable and renewed her Abilify. Tr. 277, 281. Plaintiff missed her Mid-Erie appointments in October.  Tr. 287, 290.

On November 5, 2015, Plaintiff had an initial therapy appointment at Mid-Erie with Megan Delo, LMSW ("Ms. Delo"). Tr. 292. Upon MSE, Plaintiff was alert, fully oriented, and had appropriate hygiene; her eye contact was poor; her affect was euthymic; and she had logical and

intact thoughts, and fair insight and judgment. *Id*. When Ms. Delo commented that Plaintiff was very quiet, Plaintiff said she did not have any issues to work on. *Id*. Plaintiff reported she was in nursing school at the community college, and she had a job at a mall for the holiday season. *Id*.

On December 31, 2015, state agency psychologist Terri Bruni, Ph.D. ("Dr. Bruni"), reviewed Plaintiff's file and opined that her affective disorder did not meet or equal a Listed impairment. Tr. 73, 82, 88. Dr. Bruni opined that Plaintiff could understand and remember simple and some complex instructions and procedures; maintain adequate attention and concentration to complete work-like procedures and can sustain a routine; is able to relate and respond in an appropriate manner; and can adapt to changes in a routine work setting and can use appropriate judgment to make work-related decisions. Tr. 77, 86, 89. Dr. Bruni concluded that Plaintiff did not have a disabling mental impairment. Tr. 78, 87.

On February 18, 2016, Plaintiff was discharged from treatment at Mid-Erie due to multiple no-shows. Tr. 368, 369. She contacted Mid-Erie and asked to just see the psychiatrist and not go to counseling; however, she was informed she had to attend counseling if she was prescribed psychiatric medication. Tr. 368, 369. Ms. Delo provided Plaintiff information on finding a new doctor. Tr. 368.

On June 7, 2016, a diagnostic review from Lake Shore Behavioral Health ("Lake Shore") noted that Plaintiff's diagnosis was bipolar I disorder, current or most recent episode unspecified. Tr. 321-322.

On July 19, 2016, Plaintiff saw Brian Pell, M.D. ("Dr. Pell"), at the mental health unit at Erie County Medical Center ("ECMC") for a medication refill. Tr. 476. She reported she had run out of Abilify a few weeks earlier; she was receiving outpatient treatment at Lake Shore; and she was unable to pick up her prescription because her Medicaid insurance had lapsed in June 2016.

*Id.* Dr. Pell noted that Plaintiff had a long history of noncompliance with outpatient mental health follow-up and frequent missed appointments. *Id.* MSE revealed Plaintiff was cooperative and calm with coherent speech and euthymic mood. *Id.* Her affect was restricted, and her thought process was simple and concrete. *Id.* Plaintiff denied any harmful or abnormal thought content, or any perceptual abnormalities, and she was fully oriented and had intact recent and remote memories. *Id.* Intellectual functioning was impaired, and insight was limited. *Id.* Plaintiff was assessed with bipolar mood disorder; she was stable on discharge; and she was provided instructions to follow-up with ECMC's medication and prescription clinic. Tr. 476-78.

On July 28, 2016, Plaintiff was seen by Yogesh Bakhai, M.D ("Dr. Bakhai"), at ECMC for a medication refill. Tr. 469-471. She reported she had been out of her medication for about a month. Tr. 469. She also reported she had been treating at Mid Erie, but she had been discharged due to missed appointments; her Medicaid had lapsed; and she was currently receiving treatment at Lake Shore. *Id.* She had poor eye contact, mumbled speech, flat affect, and some delayed response time. *Id.* She stated she was working full time as a teacher's aide at Head Start, and she was "feeling tired a lot." Tr. 469-70. Dr. Bakhai assessed psychotic disorder and prescribed Abilify 20mg. Tr. 470.

On August 3, 2016, Plaintiff had a psychiatric initial evaluation at Lake Shore with Rachel Burns, PNP ("Ms. Burns"). Tr. 333-338. Plaintiff reported she was working full-time and said she was taking Abilify. Tr. 334, 335. Her chief complaint was bipolar disorder. Tr. 333. Upon MSE, Plaintiff was cooperative and made good eye contact, and her speech was monotone with normal volume and some latency of response. Tr. 335. No psychomotor abnormalities were present. *Id.* Plaintiff described her mood as "ok," and her affect was congruent with mood. *Id.* Her thought process and thought content were normal. Tr. 336. Plaintiff denied audio or visual hallucinations

or harmful ideation. *Id*. She was fully oriented with fair attention and concentration. *Id*. Recent memory was good; remote memory was fair; and insight and judgment were fair. Tr. 336-37. Ms. Burns assessed a Global Assessment of Function ("GAF")[1] score of 50, diagnosed bipolar disorder with psychosis, prescribed Abilify 20mg daily, and instructed Plaintiff to attend counseling and return in six weeks. Tr. 337. Shortly thereafter, on September 19, 2016, Plaintiff was discharged from Lake Shore due to five consecutive no-shows. Tr. 330.

As noted above, the relevant period in this case began December 31, 2016. On January 26, 2017, Plaintiff was seen by Dr. Bakhai at ECMC. Tr. 460-62. Plaintiff reported she had run out of Abilify about one month earlier. Tr. 460. She said she had not been able to attend counseling because she was working two jobs. *Id*. She denied any symptoms and wanted to renew her Abilify. Tr. 460, 461. Plaintiff also said she wanted to go back to school. Tr. 461. Dr, Bakhai noted that Plaintiff was minimally engaged, had restricted affect, her thoughts were organized, and she denied harmful ideation. Tr. 460. Upon MSE, Plaintiff was well dressed, cooperative, calm, and appropriate. Tr. 461. Her speech was normal; her mood was euthymic, and she had appropriate affect. *Id*. She had normal thought process and thought content; she denied any perceptual abnormalities; she was fully oriented with intact recent and remote memory; and her insight and judgment were fair. *Id*. Dr. Bakhai diagnosed bipolar II mood disorder and renewed her Abilify. *Id*.

On March 4, 2017, Plaintiff fractured her left femur when she tried to do a split while playing a drinking game; she later had surgery and physical therapy. Tr. 434, 443, 446.

---

[1] The GAF is a "multiaxial scale is used to assess an individual's mental and physical condition on five axes, each of which refers to a different class of information." *See Wilson v. Berryhill*, No. 16-CV-00664V(F), 2018 WL 4211322, at *2 (W.D.N.Y. Sept. 4, 2018) GAF scores are designed to consider factors outside those used in disability determinations. The Court recognizes that the Social Security Administration has limited the manner in which GAF scores are used because they are generally not useful without additional supporting description and detail. *See Mainella v. Colvin*, No. 13-CV-2453, 2014 WL 183957, at *5 (E.D.N.Y. Jan. 14, 2014) (internal citations omitted).

On May 5, 2017, Plaintiff saw Zach Juliano, PA ("Mr. Juliano), at Community Health Center of Buffalo, for an annual physical. Tr. 516-18. Plaintiff reported she broke her femur in March and had a rod placed. Tr. 516. She denied any depressive symptoms and said her last appointment at Lake Shore was six months earlier. *Id*. Plaintiff said she had a positive home pregnancy test, and she felt well. *Id*. Upon examination, she was alert, oriented, and cooperative. Tr. 516-17. In light of her pregnancy, Mr. Juliano advised Plaintiff to contact Lake Shore regarding an alternative medication to replace Abilify. Tr. 516-18.

That same day, Alexis Brown, MCSW, LMSW ("Ms. Brown"), with Lake Shore, reported that Plaintiff said she was not currently working due to recent surgery. Tr. 323. Her diagnosis was bipolar I disorder, current or most recent episode unspecified. *Id*. Ms. Brown also noted that Plaintiff reported she was pregnant. *Id*.

Plaintiff was five weeks pregnant when she presented at Lake Shore on May 16, 2017, for a psychiatric initial evaluation. Tr. 339-44. Her chief complaint was that she did not know what medication she could use while pregnant. Tr. 339. She had stopped taking Abilify ten days earlier but denied any change in symptoms since stopping that medication. Tr. 339, 340. Plaintiff said her last manic episode was in 2011, and her depressive symptoms were infrequent.  Tr. 339. She had been out of work since January due to a layoff at General Motors ("GM"), and she was receiving temporary disability. Tr. 339, 341. Her psychosocial stressors were noted to be her pregnancy, not working, difficulty engaging in treatment, and medical issues. Tr. 340. Plaintiff said she had a "conflictual" relationship with the father of her unborn child. Tr, 341. She was attending physical therapy due to her femur fracture and surgery. *Id*.

Upon MSE, Plaintiff was neat, clean, and dressed appropriately. Tr. 341. She was "calm, tearful at times[,] somewhat cooperative," and she had "fair to poor" eye contact. *Id*. She exhibited

clear speech and gave appropriate answers that were "very brief [and] curt." Tr. 342. There were

no psychomotor abnormalities present. *Id*. When asked to describe her mood, Plaintiff responded,

"I am tired." *Id*. Plaintiff's affect was "closed" and "mostly congruent with mood." *Id*. She had

unremarkable thought process and thought content; she denied any perceptual disturbances or

harmful ideation; she was alert and fully oriented; and her concentration, attention, recent and

remote memory, intelligence, abstract reasoning, and fund of knowledge were all within normal

limits. Tr. 342-43. Her insight and judgment were fair. Tr. 343. Plaintiff was ambivalent about her

unplanned pregnancy and said she did not feel ready; her therapist provided reassurance that

Plaintiff would receive monitoring and care during her pregnancy. *Id*. Her diagnosis was bipolar

disorder with psychotic features by history. *Id*. On June 20, 2017, Plaintiff was discharged from

Lake Shore due to five consecutive no-shows. Tr. 330.

On July 25, 2017, Plaintiff was taken by EMS to ECMC because she was not "acting right."

Tr. 422-23. Plaintiff told the emergency room doctor she didn't know why she was admitted, but

she said police were called after her mother kicked her out of the house. Tr. 411. Plaintiff had been

non-compliant with medication for the last four months due to her pregnancy. Tr. 423. She

complained of abdominal pain and feared she would lose her unborn child. *Id*. Plaintiff was quiet

during her overnight stay, but in the morning, she began screaming that she wanted out and

threatened to "kill all of the people here," and she was going to "press charges." *Id*. Upon

examination, she was resistive, paranoid, labile, and was admitted for inpatient treatment due to

her inability to care for herself and her threats to harm others. Tr. 423.

ECMC staff called Plaintiff's sister who stated that Plaintiff was increasingly paranoid and

thought her mother and sister were persecuting her in a manner that put her unborn child at risk.

Tr. 423. Plaintiff told ECMC staff that she recently stopped getting unemployment benefits and

12

had an SSI appeal. Tr. 418. Plaintiff completed inpatient treatment that included Abilify and went home on August 25, 2017. Tr. 409. It was noted that Plaintiff "remained in her baseline Abilify without issue" while she was inpatient. Tr. 437. MSE at discharge noted that Plaintiff was calm, cooperative, and made good eye contact; there was no psychomotor abnormality; and her grooming and hygiene were good. Tr. 409. Plaintiff said her mood was good, and her affect was euthymic, congruent, and of good range. *Id*. Thoughts were linear, logical, and reality based; no delusions were elicited; and no harmful ideation was present. *Id*. Plaintiff denied any perceptual disturbances, and she was alert, fully oriented, and her cognition was intact. *Id*. Her family was supportive, and Plaintiff was stable for discharge and described as being in good spirits with good insight. *Id*.

On October 9, 2017, Plaintiff presented at ECMC for medication refill and post-discharge follow-up; she said she had been out of Abilify for approximately one week. Tr. 406. She was 28 weeks pregnant and looked forward to the baby. *Id*. Plaintiff told Dr. Bakhai that she was doing well and had no complaints. Tr. 407. MSE was unremarkable with euthymic mood, appropriate affect and normal thoughts and perceptions. *Id*. Plaintiff had been attending her appointments. *Id*. Diagnoses were schizophrenia and pregnancy, and Abilify 20mg was continued. *Id*.

On November 2, 2017, a Lake Shore diagnostic review indicated that Plaintiff's diagnosis was bipolar I disorder, current or most recent episode depressed, with psychotic features. Tr. 384.

As noted above, Plaintiff's first point of error argues that the ALJ's RFC is unsupported by substantial evidence because the ALJ relied only on Dr. Bruni's opinion and failed to seek other opinions. *See* ECF No. 9-1 at 10-15. As discussed below, the ALJ properly considered the medical evidence along with other evidence in the record, including Plaintiff's own statements, in assessing Plaintiff's RFC. Tr. 96-103. *See* 20 C.F.R. §§ 404.1513, 416.913; *Monroe v. Colvin*, 676 F. App'x

5 (2d Cir. 2017) (finding that substantial evidence supported the ALJ's RFC, even despite a lack of supportive functional assessment from a medical source).

A claimant's RFC is the most she can still do despite his limitations and is assessed based on an evaluation of the all relevant evidence in the record. *See* 20 C.F.R. §§ 404.1520(e), 404.945(a)(1), (a)(3); SSR 96-8p, 61 Fed. Reg. 34,474-01 (July 2, 1996). At the hearing level, the ALJ has the responsibility of assessing the claimant's RFC. *See* 20 C.F.R. § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996). Determining a claimant's RFC is an issue reserved to the Commissioner, not a medical professional. *See* 20 C.F.R. § 416.927(d)(2) (indicating that "the final responsibility for deciding these issues [including RFC] is reserved to the Commissioner"); *Breinin v. Colvin*, No. 5:14-CV-01166(LEK TWD), 2015 WL 7749318, at *3 (N.D.N.Y. Oct. 15, 2015), *report and recommendation adopted*, 2015 WL 7738047 (N.D.N.Y. Dec. 1, 2015) ("It is the ALJ's job to determine a claimant's RFC, and not to simply agree with a physician's opinion.").

Furthermore, it is the claimant's burden, not the Commissioner's, to demonstrate the functional limitations she claims. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require."); 42 U.S.C. § 1382c(a)(3)(H)(i) (incorporating by reference 42 U.S.C. § 423(d)(5)(A)); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012) (it is Plaintiff's burden to establish that she is disabled); *Parker v. Berryhill*, No. 17-CV-252-FPG, 2018 WL 4111191, at *4 (W.D.N.Y. Aug. 29, 2018) (holding that a plaintiff bears the burden of showing her RFC is more limited than that found by the ALJ) (citations omitted).

The ALJ explained that she considered Dr. Bruni's opinion and assigned it great weight because Dr. Bruni was knowledgeable about the disability program and her opinion was consistent

with the record as a whole. Tr. 103. The opinions of state agency doctors can constitute substantial evidence. *See Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983); *Palmer v. Berryhill*, No. 17-CV-6260-FPG, 2018 WL 3537074, at *5 (W.D.N.Y. July 23, 2018). As noted above, Dr. Bruni opined that Plaintiff retained the mental RFC to understand and remember simple and some complex instructions and procedures; can maintain adequate attention and concentration to complete work-like procedures and can sustain a routine; is able to relate and respond in an appropriate manner; and can adapt to changes in a routine work setting and can use appropriate judgment to make work-related decisions. Tr. 77, 86. Dr. Bruni's opinion is fully consistent with the ALJ's RFC for a full range of work at all exertional levels; with no more than simple, routine work, simple workplace decisions, occasional interactions with supervisors, coworkers, and the public, and no work at production rate (e.g., assembly line) pace. Tr. 99.

The ALJ noted Dr. Bruni's opinion that Plaintiff had mild restriction of activities of daily living, mild difficulties in in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace and one or two episodes of decompensation. Tr. 103, 73, 82. Those limitations were consistent with Dr. Bruni's mental RFC as set forth above and were consistent with the ALJ's RFC limiting Plaintiff to simple, routine work, simple workplace decisions, occasional interactions with supervisors, coworkers, and the public, and no work at production rate pace.

Plaintiff also asserts that Dr. Bruni's opinion is contradicted by subsequent changes in her condition.  *See* ECF No. 9-1 at 12-14. Dr. Bruni's opinion was rendered on December 31, 2015. Tr. 78. For the reasons explained below, Plaintiff's argument fails. "[A] more dated medical opinion may constitute substantial evidence where it is supported by the record as a whole notwithstanding its age." *Andriaccio v. Berryhill*, 18-CV-84, 2019 WL 1198357, at *3 (W.D.N.Y.

Mar. 14, 2019). Further, "a medical opinion is [not] stale merely because it predates other evidence in the record, where . . . the subsequent evidence does not undermine [the opinion evidence]." *Hernandez v. Colvin*, 2017 WL 2224197, *9 (W.D.N.Y. 2017) (citing *Camille v. Colvin*, 652 F. App'x 25, 28 n.4 (2d Cir. 2016) (summary order). Furthermore, the ALJ's decision reflects that he considered changes in Plaintiff's condition after Dr. Bruni's opinion.

First, the ALJ noted that Plaintiff had increased symptoms from March 2016 through July 2016 because she lost her job and had no insurance to get her medication. Tr. 101, 470. The ALJ also noted that Plaintiff's mental status examination during that period revealed a restricted and/or flat affect, impaired insight, and limited judgment, but was otherwise unchanged. Tr. 101. The ALJ further noted that Plaintiff was seen in the emergency room in June and July 2016 to obtain medication refills.  Tr. 101, 476, 469-71.

The ALJ also considered Plaintiff's July 2017 inpatient treatment at ECMC. Tr. 101-02. The ALJ noted that during her hospitalization, Plaintiff initially was severely agitated and required injectable medication, but she slowly improved and was discharged on August 25, 2017. Tr. 102, 423. As noted above, Plaintiff had not been taking her medication for the previous four months due to her pregnancy. Tr. 423. As the ALJ noted, Plaintiff was in fair spirits at the time of discharge, and her MSE was within normal limits. Tr. 102, 409. Furthermore, as noted above, Plaintiff "remained in her baseline Abilify without issue" while she was inpatient. Tr. 437. Following her discharge, Plaintiff improved when she took the medication. As the ALJ noted, there were few treatment notes after July 2017, except for a follow-up examination in October 2017. Tr. 102. Plaintiff said she was doing well and had no complaints, and Dr. Bakhai reported unremarkable MSE findings. Tr. 407.

In sum, the record reflects that Plaintiff had a history of bipolar disorder that was successfully treated with Abilify despite her long history of missed appointments and noncompliance with counseling. Tr. 273, 287, 327, 330, 368-369, 460, 474. However, even without regular counseling, Plaintiff denied significant mental problems as long as she took her prescribed medication. Tr. 295, 270-271, 473. The record demonstrates that when Plaintiff was compliant with her medication, she was able to attend community college, work multiple jobs (including several simultaneously), and had a romantic relationship that resulted in pregnancy. Tr. 30, 278, 292, 334-35, 460.

Plaintiff also unpersuasively argues that the ALJ erred by not seeking additional opinion(s). *See* ECF No. 9-1. at 14-15. "The ALJ is not required to develop the record any further when the evidence already presented is 'adequate for [the ALJ] to make a determination as to disability.'" *Janes v. Berryhill*, 710 F. App'x 33, 34 (2d Cir. 2018) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (internal quotation marks omitted). Furthermore, there is no evidentiary gap in the record where "the record contain[s] sufficient other evidence supporting the ALJ's determination and the ALJ weighed all of that evidence when making his residual functional capacity finding." *Johnson v. Colvin*, F. App'x 44, 46 (2d Cir. 2016) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (refusing to remand "solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity")).

The record in this case reflects that the ALJ set forth an extensive summary of the evidence. Tr. 96-103. As discussed above, the record demonstrates that when Plaintiff was compliant with

medication, she was able to perform extensive activities including work and attend community college. Tr. 30, 278, 292, 334-335, 460. Thus, the ALJ appropriately considered evidence of claimant's improvement with treatment and medication. *Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013); *see Marnell v. Comm. of Soc. Sec.*, No. 17-CV-6201P, 2018 WL 3620152, at *12 (W.D.N.Y. July 30, 2018) (affirming ALJ's decision that claimant was "not disabled;" ALJ appropriately considered claimant's medical records which indicated that therapy and medication were generally effective in controlling his depression and anxiety symptoms).

Furthermore, the record is devoid of any treating source stating that Plaintiff was disabled and unable to work. "The [Commissioner] is entitled to rely not only on what the record says, but also on what it does not say." *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983). Based on the foregoing, the Court finds no error in the ALJ's consideration of the medical opinion evidence.

In her second point, Plaintiff argues that the ALJ erred in evaluating her subjective complaints and mischaracterized her daily activities. *See* ECF No.9-1 at 15-22. However, the ALJ articulated good reasons for her finding that Plaintiff's subjective complaints were not consistent with the record evidence. "While an ALJ is required to take the claimant's complaints into account, [the ALJ] is not required to accept those complaints without question." *Taillon v. Comm'r of Soc. Sec.*, 2019 WL 1396837 (W.D.N.Y. March 28, 2019) (citing *Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012). The ALJ decides the issue of the consistency of Plaintiff's subjective statements and "is not require[d] to accept the claimant's subjective complaints without question." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

The ALJ here provided ample good reasons for questioning the accuracy of Plaintiff's subjective allegations. The ALJ considered Plaintiff's testimony, reports, and statements about her condition, complaints and functioning and noted several inconsistencies in her accounts. Tr. 99-

103. For example, the ALJ noted that in 2015, Plaintiff twice claimed she had never worked before she applied for benefits (Tr. 225, 228), but her income reports indicate she first worked in 2011 and continued to work each year since then (Tr. 198-99). Tr. 102.

Plaintiff also alleged anxiety around crowds and an inability to leave the house alone, but the ALJ noted that Plaintiff had worked a number of jobs in retail and also worked in a coffee shop serving coffee. Tr. 102. As the ALJ noted, Plaintiff also worked on an assembly line at GM, worked with children in Head Start, and attended community college studying nursing. Tr. 101-02, 24-26, 198-200, 278, 292. Most of these jobs required frequent interaction with others.  The ALJ also observed that at the time of her July 2017 hospitalization, Plaintiff reported she was feeling overwhelmed because she was working four jobs. Tr. 102, 25, 30, 460. The ALJ noted that Plaintiff testified she had not looked for work after that. Tr. 102, 29.

Furthermore, Plaintiff testified she was on call at GM from September through December 2017, and she was called back at times to work one or more days per week. Tr. 102, 28. The ALJ properly considered Plaintiff s part-time work as evidence that plaintiff was capable of performing work. *Downs r. Colvin*, No. 6:15-cv-6644, 2016 WL 5348755, at *12 (W.D.N.Y. Sept. 26, 2016) ("[t]he Commissioner's regulations provide that part-time work, even if not substantial gainful activity, may show a claimant is able to do more than they actually did.").  Additionally, the ALJ noted that Plaintiff was attending college, shopping in stores, and attending church during the time she stated she was unable to leave the house alone and had anxiety in crowds. Tr. 102.

The ALJ also considered Plaintiff's noncompliance with counseling and her multiple discharges from care. Tr. 100, 287, 327, 330, 368-369, 460, 474. An ALJ may reasonably consider a pattern of noncompliance by Plaintiff. *See, e.g., Wilson v. Colvin*, No. 16-cv-6509, 2017 WL 2821560, at *6 (W.D.N.Y. June 30, 2017); *Nicholson v. Colvin*, No. 13-cv-1296, 2015 WL

1643272, at *7 (N.D.N.Y. April 13, 2015). The ALJ noted that Plaintiff told Ms. Delo she had no issues to work on. Tr. 100, 292. A few months later, Plaintiff indicated she did not want to go to counseling and wanted to only see a psychiatrist for medication. Tr. 368). Despite Plaintiff's assertion that "the ALJ chastised a mentally ill woman for failing to maintain consistent mental health treatment" (*see* ECF No.9-1 at 16), the record suggests that at the very least some of Plaintiff's missed appointments were deliberate, not due to her mental impairments.

Similarly, the ALJ pointed to the effectiveness of Abilify when Plaintiff actually took the medication. Tr. 100, 270-71, 473. The medication was effective when taken, as shown by Plaintiff's ability to work multiple jobs and go to community college. Tr. 30, 278, 292, 334-35, 460. Improvement with treatment is a proper factor for the ALJ to consider in determining disability. *Reices-Colon v. Astrue*, 523 F. App'x at 799. While Plaintiff asserts that some of her inconsistencies were due to her mental health condition, the record shows that when she took her medication, she was able to work and did work two jobs at once. In addition to workplace and school interactions, Plaintiff interacted with doctors and, when she chose to attend, with counselors. Based on the foregoing, the ALJ reasonably found Plaintiff's complaints were not consistent with the record evidence.

While Plaintiff may disagree with the ALJ's conclusion, the Court must "defer to the Commissioner's resolution of conflicting evidence" and reject the ALJ's findings "only if a reasonable factfinder would have to conclude otherwise." *Morris v. Berryhill*, No. 16-02672, 2018 WL 459678, at *3 (2d Cir. Jan. 18, 2018) (internal citations and quotations omitted); *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) (summary order) ("Under this very deferential standard of review, once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise."). Further, it is the ALJ's duty to evaluate conflicts in the

evidence. *See* 20 C.F.R. § 404.1527(c)(i); *Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 7 (2d Cir. 2017) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (quoting *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

For all the reasons explained above, the Court finds that the ALJ appropriately considered the evidence of record, including Plaintiff's reports, her testimony, medical reports, and medical opinion evidence, and the ALJ's determination was supported by substantial evidence. Accordingly, the Court finds no error.

## CONCLUSION

Plaintiff's Motion for Judgment on the Pleadings (ECF No. 9) is **DENIED**, and the Commissioner's Motion for Judgment on the Pleadings (ECF No. 11) is **GRANTED**. Plaintiff's Complaint (ECF No. 1) is **DISMISSED WITH PREJUDICE**. The Clerk of Court will enter judgment and close this case.

**IT IS SO ORDERED**.

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE